**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**


| | | |
|---|---|---|
| **Melanie Peak,** | ) | **CASE NO.1:12 CV 2824** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **Angela Ogletree, et al.,** | ) | <u>**Memorandum of Opinion and Order**</u> |
| | ) | |
| **Defendants.** | ) | |

<u>**Introduction**</u>

This matter is before the Court upon defendants' Motion for Summary Judgment (Doc. 26).  This case arises out of plaintiff's former employment with defendants. For the following reasons, the motion is GRANTED.

<u>**Facts**</u>

Plaintiff Melanie Peak filed her Complaint in the Cuyahoga County Common Pleas Court.  It was removed on the basis of federal question jurisdiction.  A First Amended Complaint was filed naming as defendants Angela Ogletree, William Hills, Elise Hara, Leisha

1

Coggins, and Cuyahoga County.[1]

Plaintiff submits her declaration wherein she states the following. Plaintiff began working for Cuyahoga County as an Income Maintenance Worker 3 in 1988.  She was later promoted to the position of EFS (Department of Employment and Family Services) Eligibility Specialist.  In that capacity, plaintiff was primarily responsible for the daily interviewing of clients and determining eligibility for public assistance benefits including cash, food, and medical assistance pursuant to county and state rules and regulations.  Plaintiff was a member of the union. In 2008, she received an Achievement Award for her work as an EFS Specialist.

Prior to 2010, plaintiff experienced an alarming growth in her caseload.  She requested assistance from management including defendants Ogletree, Hills, and Coggins, but they refused. Plaintiff reported her concerns to the union and management.

For 18 months prior to May 2010, plaintiff used, with defendants' knowledge, a cool mist humidifier in her workplace for her long term medical condition which included allergies, breathing difficulties, and chronic sinus problems.  On May 13, 2010, EFS management wanted plaintiff to remove the humidifier because the noise disturbed co-workers. On May 14, 2010, plaintiff brought a medical report to EFS management to verify her medical request for the use of the humidifier. Ogletree told plaintiff she did not care about the doctor's note. Hill instructed  plaintiff to turn the humidifier off immediately and told plaintiff that she was just using it to "drown out" her co-workers.  After plaintiff discontinued

---

[1]    Leisha Coggins was named as a defendant in the original Complaint.  The First Amended Complaint does not identify the defendants in its caption, and Coggins is not listed as a defendant under the section entitled, "Parties."  However, the First Amended Complaint refers to Coggins in the body of the pleading.  The Court will assume she is still a defendant.

2

use of the humidifier, she repeatedly requested transfer of her workstation so that she could use the humidifier without disturbance.  All requests were denied.

On several occasions after May 14, 2010, plaintiff contacted the county's Human Resources Department to report her concerns about her medical condition and the derogatory comments directed at her regarding her breathing difficulties in the work place.  The Human Resources Department did not investigate her allegations.

After she "initially" contacted the Human Resources Department regarding her disability, plaintiff received a warm mist humidifier around June 17, 2010.  Plaintiff requested a cool mist humidifier as a replacement on October 10, 2010, which was not finally approved until 2011.

After June 2010 when she reported disability concerns and discriminatory behavior to EFS management and the Human Resources Department, plaintiff was subjected to numerous adverse employment actions and retaliation.  Also in June 2010, Ogletree falsely accused plaintiff of intentionally withholding welfare benefits to applicants, and Ogletree and Hills instructed plaintiff to approve ineligible applicants for benefits.  Plaintiff "actively challenged these instructions."

In August and September 2010, plaintiff lodged complaints with EFS management and the union that she was being approached in the parking lot by county applicants inquiring about the status of their benefits.  On September 24, 2010, Ogletree falsely accused plaintiff of being insubordinate for failing to meet with a walk-in applicant although defendant Hills had told plaintiff to go home because her shift had ended. Prior to September 24, 2010, plaintiff had been given oral counseling regarding the status of benefits to applicants but had

3

not been told that she had excessive customer complaints against her.

On December 1, 2010, plaintiff consulted a state welfare benefits official regarding proper county and state eligibility and verification requirements for public assistance benefits given that she was being "instructed and bullied by EFS management into illegally approving" the benefits.  After this contact, plaintiff was subjected to increased job scrutiny and adverse employment actions by Hills, Ogletree, and Coggins.

On December 16, 2010, plaintiff was ordered to attend a pre-disciplinary conference with union representatives, EFS management, and a representative of the Human Resources Department.  Plaintiff was not given a list of the applicants' complaints against her. Plaintiff prepared a written rebuttal on December 27, 2010 to the allegations of excessive client complaints in 2010.  Plaintiff denies that she treated any of her clients rudely or in a non-professional manner in 2010.

On January 5, 2011, plaintiff applied for a lateral transfer to another EFS location in order to be closer to home but it was denied.   Plaintiff's request for a cool mist humidifier to replace the warm mist humidifier was approved after January 31, 2011.

On February 17, 2011, plaintiff was notified by defendant Hara (Human Resources Director) that she would be suspended from work for five days for receiving 77 customer complaints.  The 77 complaints were fabricated by Ogletree and other EFS management in retaliation "for complaining about the illegal and fraudulent workplace practice" and "discriminatory treatment due to my disability and my active involvement with the union regarding workplace conditions."  Prior to the suspension, plaintiff had no knowledge of the complaints. Plaintiff grieved the suspension to the union.

On April 6, 2011, plaintiff contacted Jacque Ward, Associate Director of EFS, to complain about the questionable managerial practice of simply granting public assistance benefits to ineligible or non-compliant applicants.  On April 23, 2011, plaintiff, defendants, and plaintiff's union steward met.  Plaintiff was told to disregard eligibility requirements for public assistance benefits and "just give" the benefits.  During the meeting, Hills stated that plaintiff had no work performance problems. Plaintiff's union steward submits a declaration stating that Hills told plaintiff and her that plaintiff did not have a work performance problem. (Vanessa West decl.) After the meeting, plaintiff continued to complain to EFS management and the union about the practice of disregarding eligibility requirements.

On July 27, 2011, plaintiff wrote an email to the union indicating that the customer complaints involved applicants who had failed to comply with guidelines.  She forwarded a copy to EFS management who increased their scrutiny of her.

On August 18, 2011, plaintiff filed an EEOC charge alleging that her suspension was in retaliation for requesting an ADA accommodation in June 2010.  (Tab 12) Plaintiff was thereafter subjected to increased scrutiny and retaliation by defendants.

On August 25, 2011, plaintiff received a pre-disciplinary notice and conference in retaliation for filing the EEOC charge.  Plaintiff filed a second EEOC charge on October 4, 2011, alleging that her suspension was due to her disability and in retaliation for requesting the ADA accommodation in June 2010. (Tab 14) Plaintiff was terminated on October 17, 2011. Plaintiff filed a grievance with the union.[2] (pltf. decl.)

---

[2]     Plaintiff also states that she filed a third EEOC charge, but does not submit a copy of such.

5

Evidence submitted by defendants establishes the following.

Plaintiff requested an accommodation for a humidifier in June 2010 from defendant Hills who told plaintiff to contact Human Resources.  Plaintiff acknowledged in an email on June 17, 2010 that she received a humidifier.  On October 6, 2010, plaintiff sent an email to county representatives requesting that the hot mist humidifier provided to her by Human Resources be replaced by a cool mist humidifier.  On October 12, 2010, Lori Acosta, the Employee Relations Specialist, acknowledged by email plaintiff's request for the humidifier and notified her of the need to complete paperwork for the ADA accommodation.  By letter of October 14, 2010, another Human Resources representative sent plaintiff an ADA Accommodation request form for completion.  On November 4, 2010, that representative sent paperwork to plaintiff's physician.  On November 4, 2010, plaintiff was notified by Acosta that she had been assigned to evaluate plaintiff's request and that a process would follow.  On January 31, 2011, after consideration of medical documentation, Acosta recommended to Jacque Ward, Interim Director of the Department of Employment Services, that a cool mist humidifier be provided to plaintiff. By email of June 6, 2011, Acosta asked that plaintiff confirm that the requested ADA accommodation was approved and that the equipment had been provided.  Plaintiff responded, "Yes, humidifier received.  Thank you."  (Lori Acosta decl., Exs. A-K)

Angela Ogletree, Supervisor in the Department of Employment and Family Services, was responsible for the work of seven to ten Eligibility Specialists who, *inter alia,* were responsible for interviewing applicants for public assistance benefits and reviewing the information necessary to determine their eligibility for various public assistance programs.

6

Ogletree became plaintiff's supervisor in April 2010. (Ogletree decl.)  William Hills was the Team Coordinator and Ogletree's supervisor.  (Hills decl.)

Soon after Ogletree began supervising plaintiff, she became aware of numerous complaints from customers dealing with plaintiff about delays, lack of access, and unpleasant attitude. The county's Customer Relations department forwarded to plaintiff written complaints on May 7, 2010, May 18, 2010, and June 3, 2010 which had been received about plaintiff's attitude/lack of professionalism with the clients who had also requested new case workers.[3]  (Doc. 30-3)

Ogletree had meetings with plaintiff on May 13, 2010, May 19, 2010, June 7, 2010, August 10, 2010, and October 1, 2010 to discuss the continuing customer complaints.  (*Id.*) Ogletree memorialized the meetings with plaintiff and advised plaintiff as to how to improve. Customers continued to write complaints about plaintiff. For example, an August 20, 2010 written letter complained that plaintiff was "very disrespectful," could not be reached, and had a "very bad attitude. (*Id.*)

The incident that led to initiation of disciplinary charges against plaintiff occurred on September 24, 2010.  A letter from a social worker explained the background regarding the termination of the social worker's clients's medical coverage after plaintiff insisted that the client had a savings account despite the social worker's repeated proof to plaintiff that this did

---

[3]     As discussed below, Valerie Baker, Customer Relations Manager in the Customer Relations Unit, submits a report of the complaints received in 2010 from clients of the EFS staff.  (Doc. 25 Ex. A) As evidenced by the report, plaintiff had received complaints prior to Ogletree assuming the position of supervisor over plaintiff. But, the complaints specifically addressed herein, beginning in May 2010, occurred after Ogletree became plaintiff's supervisor.

7

not exist.  Because the social worker was unable to discuss or resolve the matter with

plaintiff, she came to plaintiff's office along with the client.  After waiting an hour and a half

to see plaintiff, the social worker requested to speak to plaintiff's supervisor.  The social

worker was informed by plaintiff's supervisor, Ogletree, that plaintiff would be down to see

her, but such did not occur after another 15 minute wait. (*Id.*)

On September 28, 2010, Ogletree wrote a lengthy memorandum to Human Resources

requesting a disciplinary investigation.  Ogletree set forth the September 24 incident and

explained that the social worker had requested to speak with her after all previous attempts to

reach plaintiff had been unsuccessful.  At about 3:57 p.m. on that day, Ogletree went to

plaintiff's office to inform her that an angry client was waiting in the lobby and that she

needed to at least let the client know something.  Plaintiff refused, saying that it was time for

her to go home. Ogletree considered plaintiff's behavior to be insubordination.  (Doc. 30-4)

Further written complaints were received from clients regarding plaintiffs' attitude,

lack of professionalism, and lack of access on October 6, October 7, October 11, October 12,

October 13, and October 15. (Doc. 30-3) Plaintiff was notified by memorandum from the

Customer Relations department as to each of the complaints. (*Id.*)

On October 21, 2010, Ogletree sent plaintiff an email stating:

Human Resources is requesting that I obtain a statement from you about what
occurred on 9/24/10 (Friday), the day that I asked you to address the social worker...
in the lobby.  Please forward your statement of what you feel occurred so that I can
send it down with the other documents they are requesting in respect of a Written
Reprimand.  Thank you.

Plaintiff responded,

I have not received a written reprimand.  On 9/24/10 Angela Ogletree, Team Leader

8

> approached me at one minute to four. I informed her my off duty time is 4:00 pm.  I
> went to my coordinator, Wm. Eric Hills to convey same.  Per Wm. Eric Hills, you are
> off duty, we will handle the walk-in, go home.

(Doc. 29 Ex. 4)

On November 30, 2010, Olgletree submitted an additional request to Human

Resources for disciplinary investigation of plaintiff arising out of a November 23 complaint

from a client of plaintiff's rude and unprofessional behavior, and mistreatment of him and his

mother. Ogletree further referenced other client complaints of plaintiff's lack of

professionalism and attitude, and stated that some clients had already been removed from

plaintiff's load.  Ogletree pointed out that plaintiff had withheld food stamps from clients who

had been approved.  Plaintiff had secretly contacted state and county representatives as to

whether she was "right" in her determinations to withhold the food stamps, despite Ogletree's

direction to issue the benefits. Ogletree stated, "These are just a few people who have

complained and the call or statement has come to my attention.  These complaints as well as

the others that have been submitted [have] shown how Ms. Peaks [sic] continues without any

repercussions to terrorize and mistreat the clients in her case load."  (Doc. 30-4)

A pre-disciplinary conference was held on December 16, 2010, which ultimately

resulted in a 5-day suspension of plaintiff.  The February 17, 2011 letter informing plaintiff of

the suspension states that she was "found guilty of Insubordination and Discourteous

Treatment of the Public."  The letter explains that

> On September 24, 2010, your supervisor approached you near the end of the work day
> and informed you that a client had called her because she was waiting in the lobby to
> meet with you for over an hour and a half.  Your supervisor asked you to stop in the
> waiting room on your way out of the building and speak with the client about setting
> up a meeting time in the future.  You responded to your supervisor by stating that you
> would not comply with the request because it was 4 p.m. and it was time for you to go

9

home.  Your supervisor responded by stating that it was not yet 4 p.m. and that you needed to at least have some communication with the client.  You again refused to meet with the client, instead going to see your Center Coordinator to complain about your supervisor's request.

In addition to the above-noted incident of insubordination, you have displayed a consistent pattern of discourteous treatment of your clients.  Despite having several one-on-one meetings (5/19/10, 6/7/10, 8/10/10, 10/1/10) with your supervisor to address your lack of professionalism and courtesy in dealing with clients, you have continued to display inappropriate behavior.  In 2010, EFS management received 77 customer complaints regarding your behavior- 40 more complaints than the next highest worker at your Center.  The customer complaints consistently allege that you exhibit the following behaviors:

- Lack of response to phone calls and emails- voicemail box always full;
- Excessive wait times for face-to-face meetings;
- Rude and unprofessional;
- Talks "down" to clients;
- Treated clients like "crooks"; and
- Making clients feel like "lesser persons" because they need assistance.

You were given notice of and attended a pre-disciplinary conference (PDC) on December 16, 2010, during which you were given an opportunity to respond to the above-described charge.  In addition, you submitted a rebuttal statement dated December 27, 2010.  Regarding the insubordination charge, you stated that it was the end of the work day and that your Center Coordinator allowed you to go home upon being presented with the situation.  Regarding the charges of discourteous treatment of the public, you deny any lack of professionalism or rudeness.

Upon careful consideration of the information submitted, your assertions do not excuse your conduct in this instance. ...

(Doc. 29 Ex. 10)

Ogletree left her employment with the county in July 2011.  (Ogletree decl.)

Complaints continued to be made about plaintiff's rude and discourteous treatment of the

public, her continuing failure to timely schedule meetings with clients, her continuing failure

to timely return phone calls, and other issues.  As a result, Hills requested a disciplinary

investigation on August 3, 2011. A pre-disciplinary conference was held on August 25, 2011.

10

Hills and plaintiff attended. Plaintiff refused to answer questions about the particular issues and it was determined that she be permitted to respond in writing. Hills and Coggins would respond to plaintiff's writing. (Hills decl.)

Plaintiff was notified of her termination by letter of October 14, 2011, wherein it was noted:

> You were suspended for five days during the period of March 7 through March 11, 2011 for insubordination and discourteous treatment of the public. Since your suspension, you have continued to fail in your responsibilities to provide prompt, courteous service to the public, including failing to complete paper work in accordance with departmental standards, failing to respond to client phone calls in a timely manner, excessive delays in approving client benefits, unjustified denial of client benefits and inappropriate comments to clients.
>
> You were given notice of and attended a pre-disciplinary conference on August 25, 2011. In view of the volume of complaints, you were allowed to respond in writing to the allegations. Your response was not persuasive and does not excuse your unacceptable performance.
>
> ***

(Doc. 29 Ex. 13)

Defendants submit the declaration of Valerie Baker, Customer Relations Manager of the Customer Relations Unit of the Department of Employment and Family Services, whose duties include receiving complaints and compliments arising from encounters with or services provided by the EFS staff and entering the complaints into a database. Baker submits the reports showing complaints received in 2010 and 2011 for encounters with EFS staff members who worked in the facility where plaintiff was employed. The report shows the employee's name and the type of report communicated by the customer. (Baker decl.) Plaintiff had over 25% of the 300 complaints lodged against the 31 employees in 2010. Plaintiff had seven complaints about "attitude" and "lack of professionalism." Only two

11

other employees had one such complaint.  In 2011, although she departed in October, plaintiff had the highest number of complaints. (*Id.* Exs.)

The First Amended Complaint asserts seven claims.  Count One alleges disability discrimination and hostile work environment under the ADA and Title VII.  Count Two alleges disability discrimination and disparate treatment under the ADA and Title VII.  Count Three alleges retaliation under the ADA and Title VII.  Count Four alleges disability discrimination, disparate treatment, hostile work environment, and retaliation under Ohio's anti-discrimination statute. Count Five alleges First Amendment retaliation pursuant to Section 1983 based on plaintiff's union activity. Count Six alleges First Amendment retaliation pursuant to Section 1983 based on the public expression of matters of public concern.  Count Seven alleges intentional infliction of emotional distress.

This matter is now before the Court upon defendants' Motion for Summary Judgment.


**<u>Standard of Review</u>**

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

12

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its resolution will affect the outcome of the lawsuit."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc*., 8 F.3d 335, 340 (6th Cir.1993).  The nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).  Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment.  *Anderson*, 477 U.S. at 249-50 (citation omitted).

**Discussion**

**(1) Disability and Title VII discrimination, retaliation, and hostile work environment**

13

Count One alleges disability discrimination and hostile work environment under the ADA and Title VII.  Count Two alleges disability discrimination and disparate treatment under the ADA and Title VII.  Count Three alleges retaliation under the ADA and Title VII. Count Four alleges disability discrimination, disparate treatment, hostile work environment, and retaliation under Ohio's anti-discrimination statute.

### (a) Discrimination

In order to establish a prima facie case of ADA discrimination[4] through indirect evidence, plaintiff must show that 1) she is disabled, 2) she is otherwise qualified for the position, with or without reasonable accommodation, 3) she suffered an adverse employment action, 4) the employer knew or had reason to know of her disability, and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced. *White v. Standard Ins. Co.*, --- Fed.Appx. ----, 2013 WL 3242297 (6th Cir. 2013) (citing *Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 365 (6th Cir.2007), rev'd in part on other grounds, *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 314–17, 321 (6th Cir.2012) (en banc) (holding that the ADA prohibits discrimination that is a "but-for" cause of the employer's adverse action, overruling *Monette v. Elec. Sys. Corp.*, 90 F.3d 1173, 1177–78 (6th Cir.1996), which held that an ADA plaintiff must establish that his employer's adverse action was taken "solely" on the basis of his disability).

Once the plaintiff establishes a prima facie case, the burden shifts to the employer to offer a nondiscriminatory reason for the discharge. If the employer satisfies this burden, the

---

[4]     Although plaintiff alleges disparate treatment under Title VII, she does not address this claim.  Therefore, the Court addresses only disability discrimination. Summary judgment is warranted on Title VII discrimination.

plaintiff must introduce evidence from which a reasonable jury could conclude that the proffered explanation is actually a pretext for unlawful discrimination. *James v. Goodyear Tire & Rubber Co.,* 354 Fed.Appx. 246 (6th Cir. 2009) (citations omitted).

The Court will assume that plaintiff establishes a prima facie case because the evidence is overwhelming that the reasons for plaintiff's suspension and termination were not a pretext for disability discrimination and had nothing to do with plaintiff's request for a humidifier.

The evidence shows (and is even corroborated by plaintiff's own version of the facts) that plaintiff had been using a humidifier in her office prior to May 2010 without have gone through the county's ADA accommodation procedure.  After plaintiff was told by her supervisors to stop using the humidifier due to its noise, plaintiff requested and received a warm mist humidifier in June 2010, very shortly after contacting the Human Resources Department.   In October 2010, plaintiff requested that the warm mist humidifier be replaced by a cool mist humidifier.  Plaintiff was directed to go through the ADA accommodation process.  In January 2011, an Employee Relations Specialist recommended that the accommodation be approved and plaintiff be provided a cool mist humidifier.  In June 2011, that representative emailed plaintiff merely to confirm that the accommodation had been approved and the humidifier had been provided.  Plaintiff responded that it had.

There is no evidence that this process had anything to do with plaintiff's suspension and termination.  As discussed above, the evidence submitted to the Court establishes the following. Ogletree became plaintiff's supervisor in April 2010.  Hills was Ogletree's supervisor.  Soon after Ogletree assumed this position, she became aware of numerous written

complaints about plaintiff's attitude and lack of professionalism.  The complaints were memorialized and plaintiff was informed by the county's Customer Relations Unit about them. The complaints were also recorded by that Unit. In fact, written complaints were made by clients on May 7, 2010 and May 11, 2010.  (Doc. 30-3 at 209, 204) These preceded, even according to plaintiff's version of the events, plaintiff's May 13, 2010 encounter with defendants over the use of her humidifier. Moreover, plaintiff argues in her brief and states in her declaration that she reported her disability in June 2010 and was thereafter subjected to adverse employment actions.  (Doc. 29 at 5, decl. ¶24)

Ogletree had meetings with plaintiff in May, June, August, and October 2010 to address the complaints. Ogletree followed up with written memoranda regarding the meetings. In fact, the first meetings Ogletree had with plaintiff regarding client complaints occurred on May 13, 2010 and May 19, 2010.  (Doc. 30-3 at 191) These preceded plaintiff's June 2010 request for a humidifier and plaintiff's reporting of her disability.

The written complaints about plaintiff from her clients continued.  On September 28, 2010, Ogletree requested a disciplinary investigation of plaintiff after she displayed discourteous treatment of a client and insubordination of her supervisor on September 24.  At that point, plaintiff had received her humidifier in June 2010 and had not yet requested the cool mist replacement in October 2010.  While plaintiff asserts that Ogletree falsely accused her, the incident was described in a letter written by a social worker who had attempted to meet with plaintiff that day.  After that incident, numerous complaints against plaintiff were made by her clients.  Plaintiff was again notified as to each one by the Customer Relations Unit.  Ogletree requested a second disciplinary investigation of plaintiff on November 30,

16

2010 after receiving further written complaints about her.  Ogletree also noted that plaintiff had ignored Ogletree's directions and secretly contacted state and county representatives regarding plaintiff's decisions to withhold food stamps to clients. A pre-disciplinary conference was held in December 2010 wherein plaintiff was given an opportunity to respond to the allegations against her. After consideration of plaintiff's response, she was suspended in February 2011 for insubordination and discourteous treatment of the public.  It was noted that plaintiff had received 77 complaints in 2010.  These were recorded by the Customer Relations Unit.  After Ogletree left her employment with the county, Hills requested a disciplinary investigation of plaintiff in August 2011 because of continued complaints about plaintiff's rude and discourteous treatment of the public, her continuing failure to timely schedule meetings with clients, her continuing failure to timely return phone calls, and other issues.  Plaintiff was notified of her termination by letter of October 14, 2011, wherein it was noted that plaintiff continued to receive complaints from the public.  Again, the 2011 complaints were received and recorded by the Customer Relations Unit.  Plaintiff had the most complaints in her department in 2011.

Plaintiff fails to address how the reasons for her termination were pretextual.  Plaintiff notes several times that she was "falsely accused" by Ogletree, that the client complaints against her were fabricated, and that she had no knowledge prior to her suspension of the 77 complaints against her.  But, these assertions are mere self-serving speculation and not supported by evidence.  In fact, the complaints were contemporaneously written by the clients, plaintiff received notice of them from the Customer Relations Unit, and the latter recorded all the complaints.  Additionally, plaintiff attended five meetings with Ogletree in

17

2010 to address the various complaints.  These meetings were memorialized by Ogletree.

In her argument addressing disability discrimination, plaintiff does not mention

pretext.  She only argues that

> On or about May 13, 2010, Peak informed EFS management, including Defendants
> Ogletree and Hills, that she had a medically diagnosed breathing and chronic sinus
> condition and that she needed a humidifier in order to alleviate her breathing
> conditions in the workplace. On that same date and without any explanation,
> Defendants Hills and Ogletree ordered Peak to discontinue using her humidifier
> because the alleged noise from the humidifier disturbed Peak's co-workers. Peak was
> told by EFS management that Peak only needed the humidifier to drown out her other
> co-workers. Despite Peak's daily and repeated requests from County management for
> a reasonable accommodation as simple as a humidifier, EFS management refused
> Peak's request to use a humidifier that she had been using since 2009.

(Doc. 29 at 26).  Not only is this argument belied by plaintiff's own testimony that she did

receive a humidifier in June 2010 shortly after requesting the accommodation, but the

evidence submitted by defendants also shows that plaintiff's  request for accommodation was

fulfilled in June 2010 (for a warm mist humidifier) and again sometime after January 2011

(for a cool mist humidifier).  Plaintiff's assertion fails to address how her suspension and

termination was unlawful.

For these reasons, summary judgment is granted as to plaintiff's claims for disability

and Title VII discrimination.

### (b) Retaliation

Plaintiff alleges that she was retaliated against in violation of Title VII because she

filed EEOC charges and the ADA because she requested reasonable accommodations.

"To establish a prima facie retaliation case under the ADA a plaintiff must show that

she engaged in a protected activity and suffered an adverse employment action, and that there

was a causal link between the protected activity and the adverse employment action." *White*

*v. Standard Ins. Co.*, 529 Fed.Appx. 547 (6th Cir. 2013) (citations omitted). If the plaintiff presents indirect evidence to establish her prima facie case, the defendant must produce evidence of a legitimate, non-discriminatory reason for its adverse action, after which the plaintiff must show by a preponderance of the evidence that the proffered legitimate reason was not the true reason for the adverse employment action, but merely a pretext for retaliation. *Id.*

Likewise, a plaintiff may make a prima facie case of Title VII retaliation by showing that (1) he engaged in protected activity, (2) the activity was known to the defendant, (3) the plaintiff was subjected to a materially adverse action, and (4) there was a causal connection between the protected activity and the adverse action. *Herrera v. Churchill McGee, LLC* --- Fed.Appx. ----, 2013 WL 6126150 (6th Cir. November 21, 2013) (citations omitted). Upon this showing, the defendant must articulate a legitimate, nonretaliatory reason for its action. The plaintiff then must show that the proffered reason was a pretext for retaliation. *Id.*

As for ADA retaliation, for the reasons stated above, there is no evidence of a causal link between plaintiff's request for the humidifier and her suspension and termination. Nor does plaintiff offer any evidence that defendants' proffered legitimate reason for these actions was not the true reason but merely a pretext for retaliation.

As for Title VII retaliation, plaintiff states in sum as to pretext:

Here, Peak was formally terminated after she filed claims with the EEOC. On October 17, 2011, some thirteen (13) days after filing a second EEOC charge for retaliation and before that charge was ever fully investigated, Peak was terminated from [her] job as an EFS Employment Specialist after 23 years. Furthermore, prior to her termination, Peak was told during an April 23, 2011 conference with EFS management, including Defendants Ogletree and Hills, that she did not have a work performance problem, and she did more work than most of the other EFS Specialist in the office.

19

(Doc. 29 at 16)

As discussed above, even assuming there is a causal connection, there is no evidence of pretext. Moreover, Plaintiff only points to Hills's statement that plaintiff did not have a work performance problem and she did more work than most of the other EFS Specialist in the office.  However, this one statement does nothing to discredit the 77 recorded complaints against plaintiff and numerous written letters of clients submitted by defendants. Plaintiff asserts that given Hills's statement, she "reasonably believed that the 77 customer complaints were fabricated in order to retaliate against her for complaining about discriminatory treatment due to her disability and her active involvement with the union regarding workplace conditions."  (Doc. 29 at 9) As discussed earlier, however, the complaints were contemporaneously written by clients (some very lengthy) and there is no basis on which to conclude they were fabricated. The evidence clearly establishes that plaintiff was terminated due to her rude and disrespectful behavior toward her clients, and her insubordination toward her supervisor.  Plaintiff fails to provide any evidence showing that illegal motivation was more likely the reason for her suspension or termination.

Summary judgment is warranted as to the retaliation claims.

### (c) Hostile Work Environment

To make out a hostile work environment claim under the ADA or Title VII, plaintiff must show that she is disabled, was subject to unwelcome harassment, the harassment was based on her disability, the harassment unreasonably interfered with her work performance, and defendant either knew or should have known about the harassment and failed to take corrective measures. *Spence v. Donahoe,* 515 Fed.Appx. 561 (6th Cir. 2013) (citations

20

omitted).

Plaintiff's full argument as to this claim is that on several occasions after May 14, 2010, she contacted the Human Resources Department to report her concerns about her medical condition and disability and the derogatory comments made to her about her breathing difficulties.  Human Resources did not investigate the allegations.  After May 14, 2010, plaintiff had to go to the hospital emergency room because she had difficulties breathing at work without the humidifier.

To establish a work environment claim plaintiff must show that her workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment."  *Stevens v. Saint Elizabeth Medical Center, Inc.,* 533 Fed.Appx. 624 (6th Cir. 2013).  Plaintiff does not point to evidence of a workplace so permeated with ridicule or insult. Additionally, plaintiff points to once instance in May 2010 of going to an emergency room due to the lack of a humidifier, but her own testimony is that she received a warm mist humidifier in June 2010 almost immediately after requesting one.  On this basis, there is no evidence that plaintiff's work environment was abusive.

Summary judgment is appropriate as to the hostile work environment claims.

**(2) First Amendment Retaliation**

Count Five alleges First Amendment retaliation pursuant to Section 1983 based on plaintiff's union activity. Count Six alleges First Amendment retaliation pursuant to Section 1983 based on the public expression of matters of public concern.

The First Amendment protects a public employee only when she speaks as a citizen

21

addressing matters of public concern. *Keeling v. Coffee County, Tenn.*, --- Fed.Appx. ----, 2013 WL 4034415 (6th Cir. August 08, 2013) (citations omitted).  If a public employee speaks pursuant to her official duties, then she is not speaking as a citizen. *Id.*   The Court examines the "impetus for the speech, the setting of the speech, the speech's audience, and its general subject matter." *Id.*

Plaintiff asserts that her speech regarding the filing of a union grievance and challenging the practice of approving the expenditure of county and state tax dollars to unqualified and ineligible applicants are statements made as a citizen on matters of public concern. The Court disagrees.

According to her declaration, plaintiff's union grievances or reports involved her "workload and workplace concerns," being approached by angry clients in the parking lot, and challenging her suspension. (pltf. decl.¶ 7, 28, 45) Additionally, as to her communications regarding the expenditure of tax dollars to ineligible applicants, plaintiff states the following. After being instructed by EFS management to "blindly approve welfare benefits without proper income verification information, I actively challenged these instructions because this illegal practice of awarding public assistance benefits to every ineligible applicant not only violated both county and state guidelines but it was criminal fraud under state law."  (pltf. decl. ¶ 25) In December 2010, plaintiff consulted Vicki Masterson, a State of Ohio Quality Initiative Specialist welfare benefits official, about proper eligibility and verification requirements for public assistance benefits under county and state guidelines because [she] was being instructed and bullied by EFS management into illegally approving public assistance benefits to ineligible client applicants without proper verification information."

22

(*Id.* ¶ 31) In April 2011, plaintiff contacted Jacque Ward, Associate Director of EFS, to complain to her about the questionable managerial practice of simply granting public assistance benefits to ineligible and noncompliant residents."  (*Id.* ¶ 46)

Merely because plaintiff's speech was union-related does not automatically render it a matter of public concern. *Fitzpatrick v. City of Frankfort, Kentucky*, 305 Fed.Appx. 258 (6th Cir. 2008) (citing *Boals v. Gray*, 775 F.2d 686, 692 (6th Cir.1985)) ([A] public employee's speech, activity, or association does not address a matter of public concern merely because it is union related.")  Here, plaintiff's complaints to the union were directed at her own personal issues and not matters of public concern.

Similarly, as to plaintiff's communications with representatives outside her department regarding eligibility for benefits, these involved her own duties, her own job, and responses to supervisors' and clients' criticisms of the way she performed her job (i.e., withholding benefits). Therefore, plaintiff was speaking pursuant to her official duties, not as a private citizen.

Even assuming plaintiff's speech was protected, she fails, as discussed above, to create an issue of fact as to whether the disciplinary actions against her were unrelated to her job performance.

For these reasons, plaintiff's First Amendment claims fail.

**(3) Intentional infliction of emotional distress**

Count Seven alleges intentional infliction of emotional distress.  Plaintiff only argues that her "health declined as a result of the treatment that she received while employed by the County as EFS Specialist in 2010 and 2011."  (Doc. 29 at 28)

23

"To establish a prima facie claim for intentional infliction of emotional distress under Ohio law, a plaintiff must prove (1) that the defendant intended to cause the plaintiff serious emotional distress, (2) that the defendant's conduct was extreme and outrageous, and (3) that the defendant's conduct was the proximate cause of the plaintiff's serious emotional distress." *Burgess v. Fischer*, 735 F.3d 462 (6th Cir. 2013).

Since plaintiff's termination was based on legitimate, non-discriminatory reasons, she cannot establish an intentional infliction of emotional distress claim.

Summary judgment is warranted as to this claim.

**Conclusion**

For the foregoing reasons, defendants' Motion for Summary Judgment is granted.

IT IS SO ORDERED.


/s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 1/21/14

24